UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COACH, INC. and COACH SERVICES,
INC.,

       Plaintiffs,                    Case No. 11-14032

v.

                                    Hon. Paul D. Borman

DEQUINDRE PLAZA, L.L.C. d/b/a County     Magistrate Judge Laurie J. Michelson
Line Flea Market, County Line Trade Center,
County Line Antique Market; MICHAEL
SHOLEM SURNOW; JEFFREY C.
SURNOW; WESTWOOD PARTNERS II,
L.L.C.; TERRY BINGHAM; SOON HWA
KIM; ASABOR ALI; MARJORIE ESTHER
GLOGOWER; and Unknown Defendants 1-
10 (JOHN DOES),

       Defendants.

_____/

**REPORT AND RECOMMENDATION ON DEQUINDRE DEFENDANTS'
MOTION FOR SPOLIATION SANCTIONS [95]**

This trademark and copyright infringement case involves the sale of alleged counterfeit

Coach merchandise. As District Judge Paul D. Borman summarized, "[t]he Dequindre Defendants

manage and own the County Line Flea Market in Warren, Michigan, at which certain

tenants/vendors (some of whom are additional Individual Defendants in this action) sold the

counterfeit and infringing Coach goods." (Dkt. 82 at 1.) During a July 8, 2011 raid by the Warren

Police Department on the County Line Flea Market, hundreds of items of merchandise were seized,

including bags, wallets, hats, and jewelry, that purported to be manufactured by Coach. These items

were secured by Recon Management Group LLC ("Recon Management"), a private security firm

that Coach retains to conduct investigations in Michigan. (Dkt. 104 at 1.) Approximately six

months after the filing of this lawsuit, Recon Management destroyed the seized Coach merchandise

as part of its regular storage maintenance. Claiming that this "destroyed evidence is the very essence of this case," the Dequindre Defendants now seek "severe sanctions" against Coach for spoliation of evidence. (Dkt. 103.) The Dequindre Defendants' motion was referred to this Court (Dkt. 101); it is fully briefed (Dkts. 95, 104, 108) and the Court heard oral argument on March 19, 2013 (*see* Dkt. 103). For the reasons stated below, the Court finds that the level of Coach's culpability in the destruction of the evidence and resulting prejudice to the Dequindre Defendants do not warrant the severe sanctions being sought. As a result, the Court RECOMMENDS that the motion be DENIED.[1]

---

[1] There appears to be a split in authority on whether a magistrate judge should provide a report and recommendation to a district judge on a Fed. R. Civ. P. 37 motion for sanctions where, as here, the relief sought is dispositive (e.g., default judgment). *See Bell-Flowers v. Progressive Ins. Co.*, No. 04-3026, 2005 WL 3434818, at *1, 2 n.1 (W.D. Tenn. Dec. 13, 2005) (Pham, M.J.) ("The majority of courts to consider the issue have concluded that when a party brings a motion for discovery sanctions, the sanction chosen by the magistrate judge, rather than the sanction sought by the moving party, governs the magistrate judge's authority over the motion." (citing cases)).

Because several judges in this district have viewed a report and recommendation proper in this scenario, and because this Court sees no need to depart from this practice, this Court will make a recommendation to the District Court regarding the pending motion. *Flagg v. City of Detroit*, No. 05-74253, 2011 WL 4634249, at *1 (E.D. Mich. Aug. 3, 2011) (Whalen, M.J.) ("Before the Court is Plaintiffs' Request for Entry of Default and Other Sanctions Based Upon Spoliation of Evidence. Because the request for default is a dispositive motion, I will proceed by Report and Recommendation . . . ." (internal citation omitted)); *Laethem Equipment Co. v. Deere & Co.*, No. 05-10113, 2009 WL 3064663, at *1, n.1 (E.D. Mich. Sept. 21, 2009) (Komives, M.J.) ("Although [the defendant's] motion is entitled a motion for sanctions and is filed pursuant to Fed. Rules Civ. P. 26 and 37, its request for relief [seeks dismissal]. Therefore, I address this motion as a dispositive one pursuant to 28 U.S.C. § 636(b)(1)(B)" (internal citation omitted)); *Burket v. Hyman Lippitt, P.C.*, No. 05-72110, 2007 WL 891891, at *1 (E.D. Mich. Mar. 21, 2007) (Majzoub, M.J.) ("Because the motion seeks an involuntary dismissal [as a discovery sanction], the Court will recommend a disposition to the district court."); *Citizens Ins. Co. of Am. v. Moyer*, No. 04-CV-73909, 2006 WL 3289771, at *1 (E.D. Mich. Nov. 13, 2006) (Friedman, J.) ("If defendants wish to seek dismissal of the complaint as a sanction for discovery abuses, or for any other reason, they must file a motion clearly indicating as much in the caption and in that event the court would either hear the motion itself or refer it to the magistrate judge for report and recommendation, rather than for hearing and determination.").

## I.    BACKGROUND

Coach manufactures, markets, and sells fine leather and mixed material products including handbags, wallets, and accessories bearing the famous Coach trademarks.  (Dkt. 38, First Am. Compl. at ¶¶ 22-24.)  The Dequindre Defendants own and/or operate the County Line Trade Center, a Flea Market located in Warren, Michigan (the "Flea Market").  (*Id*. at ¶ 10.)  More specifically, Dequindre Plaza, LLC ("Dequindre Plaza") owns the real estate where the Flea Market operates and Westwood Partners II, LLC rents floor space in the Flea Market to tenants and/or vendors.  (Dkt. 99, Defs.' Mot. for Summ. J.)   Defendants Michael and Jeffrey Surnow are alleged to have ownership interests in Dequindre Plaza and Westwood.  (First Am. Compl. at ¶¶ 11-12.),

Coach alleges that, on November 13, 2010, a Coach representative from Recon Management LLC ("Recon Management"), a private security firm that Coach (and other manufacturers) retain to conduct investigations in Michigan, visited the Flea Market and observed numerous vendors selling merchandise bearing a Coach mark.  (First Am. Compl. at ¶ 40(a); Dkt. 104, Coach Resp. at 1.)  The Recon Management investigator purchased six handbags containing Coach marks that Coach contends it did not manufacture.  (*Id*.; Defs. Mot. at 5.)  Those six handbags are in the possession of Coach's counsel.  (Defs.' Mot. at Ex. D, Henry dep. at 110-11.)  As explained at the motion hearing, Coach obtained these handbags from Recon Management.

On November 17, 2010, Coach sent a letter to the Owner/Manager of the Flea Market advising that counterfeit goods were being offered for sale at the Flea Market and identifying the locations within the Flea Market where the merchandise was being sold.  (First Am. Compl. at ¶ 40(d).)  The letter stated:

> This letter gives you formal notice that the illegal trafficking of
> counterfeit merchandise bearing one or more of the federally

3

> registered trademarks of Coach has been taking place at, 20900
> Dequindre, Warren, MI 48089, a flea market which you own, by
> tenants who presently lease and use the premises. If you facilitate the
> continuation of this conduct by failing to prevent the ongoing
> criminal enterprise on your property, Coach intends to hold you
> responsible for all damages and fees incurred as a result.

(First Am. Compl. at Ex. A.)

On July 8, 2011, officers of the Warren Police Department were investigating a Crime Stoppers complaint regarding counterfeit merchandise sold at the Flea Market. (Dkt. 108, Defs.' Reply at Ex. R, Warren Police Dep't. Incident Rep.) The complaint indicated that several booths in the Flea Market were selling counterfeit purses, jewelry, and other items. (*Id.*) As a result, the Warren Police Department raided the Flea Market. (Dkt. 108, Defs.' Reply at Ex. R, Warren Police Dep't Incident Rep.; First Am. Compl. at ¶ 40(f).) The police officers worked in conjunction with Recon Management Investigators Darryl Henry and James Schoenherr. (Incident Rep. at Pg ID 3001.) During the raid, the officers identified three open booths that had counterfeit merchandise for sale (from multiple manufacturers and designers, in addition to Coach). (Incident Rep. at Pg ID 3001.) These were the booths operated by Defendants Soon Hwa Kim ("Kim"), Asabor Ali ("Ali"), and Marjorie Esther Glogower ("Glogower"). (*Id.* at Pg ID 3001-10.)

Ms. Glogower told the officers that the purses she was selling were not legitimate brands. (*Id.* at 3001.) The Recon Management investigators also identified the purses, as well as many other items, including wallets, jewelry and key chains, as counterfeit. (*Id.*; Coach Resp. at Ex. 1, Schoenerr Dep. at 65.) Recon Management investigators likewise identified over 100 counterfeit purses and products being sold at the booths operated by Ms. Kim and Mr. Ali. (Incident Rep. at Pg ID 3006, 3008-09.)

The Warren Police Officers requested that the Recon Management investigators transport

4

the seized merchandise to the Recon Management secured storage facility until the adjudication of the criminal cases. (Schoenerr Dep. at 66, 99.) Thus, following the raid, the alleged counterfeit Coach products were placed in the possession of Recon Management. (Defs.' Mot. at Ex. B, Lau Dep. at 92-93.) According to the testimony of Coach's in-house counsel, Ethan Lau, Coach expected Recon Management, its investigating agency, to maintain custody of those products until directed otherwise. (*Id*. at 93-94.)

In September 2011, Defendants Kim, Ali, and Glogower were charged with possession of counterfeit merchandise. (Incident Rep. at Pg ID 3002, 3010.) Ms. Kim pled guilty to a misdemeanor, Mr. Ali and Ms. Glogower pled no contest to a felony, and all three were ordered to make restitution to Coach. (Schoenerr Dep. at 67-68; Lau Dep. at 107-08.)

Coach filed this civil action on September 15, 2011. (Dkt. 1.) At that time, the alleged counterfeit merchandise seized during the police raid, including the Coach merchandise, was still at the Recon Management facility. Coach subsequently filed an Amended Complaint on March 30, 2012. (Dkt. 38.) Coach alleges direct trademark infringement against the individual Defendants and contributory infringement against the corporate Defendants – i.e., that neither Dequindre Plaza nor Westwood Partners took affirmative steps to evict the counterfeiters or to halt the trafficking in counterfeit goods, that they facilitated the sale of the counterfeit merchandise, and that they acted with reckless disregard or willful blindness to Coach's rights. (First Am. Compl. at ¶¶ 39(a) and (e), 53.) The Amended Complaint, like the initial Complaint, expressly references the raid on the Flea Market and states that "[o]ver one hundred counterfeit Coach bags, wallets, hats, and jewelry were seized in this raid. Additionally, dozens of counterfeit goods of other famous designers were also seized." (*Id*. at ¶ 40(g).)

In November 2011, shortly after the filing of the initial Complaint, counsel for the Dequindre Defendants made oral requests to Coach's counsel to inspect the goods at issue, including the merchandise seized during the July 2011 raid. (Defs.' Mot. at 6.) Written requests then followed in January and February 2012. (*Id.*) No inspection took place. On February 22, 2012, the Dequindre Defendants served discovery requests that asked Coach to produce the six bags purchased by Recon Management on November 13, 2010 as well as:

> every item that was seized during the July 8, 2011 raid at the Flea Market, including, but not limited to:
>
>> a. all 68 handbags possessed by Defendant Kim that bore the word "Coach" or one or more Coach Marks ("Kim's Handbags");
>>
>> b. all 29 wallets, the 22 purses and 1 hat that bore the word "Coach" or one or more Coach Marks ("Ali's Products");
>>
>> c. all 33 purses, the 5 wallets, 9 bracelets, 17 necklaces, 8 chains and 2 key chains that bore the word "Coach" or one or more Coach Marks ("Glogower's Products").

(Defs.' Mot. at Ex. I, Reqs. 15 and 17.) Coach responded on March 22, 2013 that the six bags had been available for inspection in its counsel's office since January and, as to the items seized in the 2011 raid, that "all responsive documents and items in its possession are already being produced in response to other discovery requests." (*Id.* at Ex. J.)

Without ever having been produced or made available for the requested inspection, the products seized during the July 2011 raid were destroyed by Recon Management in March 2012. (*Id.*) The record is clear that Recon Management had the products shredded. More specifically, Jim Schoenerr instructed Darryl Henry to destroy the products. (Defs.' Mot. at Ex. D, Henry dep. at

6

111-12, 115.)  Coach's involvement in this decision, however, is not as clear.

According to Mr. Schoenerr, Recon did not shred the products to keep them from being produced in this civil suit.  (Schoenerr Dep. at 100.)  Mr. Schoenerr testified that "the criminal cases were over and done with.  We thought we were in the clear so we shredded them, simple as that, as standard operating procedure we've been doing it for years."  (*Id.*; *see also* Henry Dep. at 108-09.)  However, it is also standard operating procedure for Recon Management to first obtain permission from its manufacturer clients before it destroys seized counterfeit merchandise.  (Schoenerr Dep. at 101; Henry Dep. at 116.).  Thus, Mr. Schoenerr believed he would have obtained this authorization from Coach, but does not recall any specific conversation with Coach.  (Schoenerr Dep. at 83, 86-87, 100-01).  Mr. Lau, Coach's in-house counsel that Mr. Schoenerr allegedly spoke to, testified that he could not recall the conversation either.  (Coach Resp. at Ex. 2, Lau Dep. at 96.)  Mr. Henry of Recon Management testified that he could also only "assume" that Mr. Schoenerr, received direction from Coach to destroy the merchandise.  (Henry Dep. at 112, 115.)

The Dequindre Defendants interpret this testimony as establishing that Coach authorized Recon Management to destroy the seized merchandise after this lawsuit was filed and after requests were made to inspect the products.  (Defs.' Mot. at 9.)  This, they claim, was intentional,  reckless, and/or grossly negligent spoliation that entitles them to severe sanctions, including dismissal of the claims against them.  (*Id.*)

Coach  presents  a  different  interpretation.   They  deny  having  any  control  over  the merchandise.  They further deny authorizing its destruction and believe this was the result of a miscommunication or misunderstanding – i.e., Recon Management believed it was safe to destroy the products because the criminal cases were over and was perhaps unaware of, or forgot about, the

still ongoing civil litigation.  (Coach Resp. at 5-6.)  Coach also disputes that the destruction of the merchandise prejudices the Dequindre Defendants' case and contends that discovery sanctions are not warranted.

## II.   ANALYSIS

### A.   Legal Framework

Pursuant to Fed. R. Civ. P. 37, a court is authorized to impose sanctions when a party fails to cooperate in discovery and/or obey a discovery order.  *Grange Mut. Cas. Co. v. Mack*, 270 F. App'x 372, 376 (6th Cir. 2008) ("A district judge holds a variety of sanctions in his arsenal, the most severe of which is the power to issue a default judgment.").  A court can also exercise its inherent powers to enter sanctions against a party due to spoliation of evidence.  *Adkins v. Wolever* (*Adkins II*), 554 F.3d 650, 653 (6th Cir. 2009) (en banc); *see also Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 107 (2d Cir. 2002) (holding that where "the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction.").  The Dequindre Defendants' motion seeks an outright dismissal of the claims against them; a limit on Coach's damages to actual damages related to the six counterfeit handbags that were not destroyed; or a prohibition on evidence that the destroyed merchandise was counterfeit or infringing.  (Defs.' Mot. at ¶ 20.)

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.,* 2009 WL 998402, at *1 (E.D. Mich. Apr. 14, 2009) (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999)).  "[I]t is within a district court's inherent power to exercise broad discretion in imposing sanctions based on

8

spoliated evidence." *Adkins II*, 554 F.3d at 653.  Spoliation sanctions are now governed by federal law.  *Adkins II*, 554 F.3d at 652-53.  The Sixth Circuit recently reiterated the principles governing spoliation sanctions:

> In *Beaven* [*v. United States Department of Justice,* 622 F.3d 540, 553 (6th Cir. 2010)] we explained that the standard for determining whether a particular spoliation sanction is appropriate is as follows:
>
> > A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.   Thus, an adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction.   This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction.
>
> 622 F.3d at 553-54 (quotation marks and citations omitted) (emphasis added).   We also described the purpose of a spoliation sanction:
>
> > When appropriate, a proper spoliation sanction should serve both fairness and punitive functions, but its severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality.   Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.
>
> *Id*. at 554 (quotation marks and citations omitted).

*Adkins v. Wolever* (*Adkins III*), 692 F.3d 499, 503-04 (6th Cir. 2012).  The Court finds that Coach's degree of fault is no more than negligence and thus, does not warrant the severe sanctions being sought by the Dequindre Defendants.

### B.   Application of the Spoliation Sanction Factors

#### 1.   *Duty to preserve*

The Dequindre Defendants must first show that Coach "had an obligation to preserve [the spoliated evidence] at the time it was destroyed" because "[i]t goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it."  *Forest Labs,* 2009 U.S. Dist. LEXIS 31555 at *5.  Parties "have an obligation to preserve evidence within their custody or control upon 'notice that the evidence is relevant to litigation'"  *Flagg v. City of Detroit*, 2011 U.S. Dist. LEXIS 114772, at *20 (E.D. Mich. 2012) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d. Cir. 1998)); *see also John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (explaining that the duty to preserve evidence arises when a party either (1) receives "notice that the evidence is relevant to litigation" or (2) should "know[] that the evidence may be relevant to future litigation.") (citation omitted).

Here, there is no question that the seized products were destroyed well after the litigation was initiated and at a time when they needed to be preserved.  Coach's initial complaint, filed on September 15, 2011, expressly references the raid and the seized products. (Dkt. 1.)  Indeed, Coach does not dispute that the seized products were evidence in this case and should have been preserved (by Recon Management).  Coach's position, however, is that it never had control of the products and that it "is inappropriate to enter sanctions against a litigant for spoliation when the evidence was spoliated by a third party."  (Coach Resp. at 3.)

10

This Court disagrees with Coach's broad pronouncement. Spoliation cases are fact specific and depend on the unique circumstances of the destruction as well as the nature of the relationship between the party and third-party responsible for the spoliation. *See Adkins*, 692 F.3d at 506 ("The more prudent path, and the one we adopt today, is to consider incidences raising spoliation questions on a case-by-case basis, considering the purposes of a spoliation sanction and the factors for determining whether one should be imposed.")

The court recognizes that in *MacSteel Inc.* v. *Eramet N. Am.*, No. 05-74566, 2006 U.S. Dist. LEXIS 83338 (E.D. Mich. Nov. 16, 2006), a case relied on by Coach, the court stated that "the duty to preserve evidence does not extend to evidence which is not in a litigant's possession or custody and over which the litigant has no control." *Id.* at *4. While it may be true that Coach did not physically *possess* the seized merchandise, that does not mean Coach lacked *control* over the merchandise. The merchandise was being stored by an entity Coach refers to as its "representative." Recon Management representatives have testified that Recon Management's general policy is to obtain authorization from Coach before it destroys any alleged counterfeit Coach merchandise. (Schoenerr Dep. at 86-86 ("we hold onto goods that are either seized or voluntarily surrendered until our clients tell us to go ahead and shred")). Coach clearly had the ability and opportunity to take possession of the products prior to their March 2012 destruction. Coach's counsel acknowledged at the hearing that Recon Management undoubtedly would have provided the merchandise to Coach upon Coach's request. Indeed, that is how Coach obtained the six remaining handbags and it is not an uncommon practice. *See* Henry Dep. at 110 (explaining that, upon request from Coach, Recon Management has previously delivered counterfeit merchandise to Coach's counsel).

Additionally, the Sixth Circuit has recently affirmed a spoliation sanction against a party

where the evidence destroyed was in the custody or control of a third party.  In *Arch Ins. Co. v. Broan-Nutone, LLC*, No. 09-319, 2011 U.S. Dist. LEXIS 99043 (E.D. Ky. Aug. 31, 2011), *aff'd*, No. 11-6221, 2012 U.S. App. LEXIS 26464 (6th Cir. Dec. 21, 2012), a fire occurred at a fire station in Mt. Sterling, Kentucky.  Under the terms of its lease, Montgomery County Fire was obligated to indemnify the City of Mt. Sterling for any damage to the building.  *Id*. at *4.  Montgomery County Fire's insurance carrier, Arch Insurance Company, determined that the cause of the fire was a defective Broan-NuTone fan/light assembly.  *Id*. at *4-5.  Arch Insurance then sued Broan-NuTone.  During the course of the litigation, both parties had the fan/light assembly inspected by experts.  (*Id*. at *5.)  Donan Engineering, an investigator retained by the City of Mt. Sterling, took custody of the fan/light assembly.  *Id*.  It subsequently sent an invoice for evidence storage to a third-party administrator representing the City of Mt. Sterling.  "Apparently wanting to avoid further storage fees, [the administrator] authorized Donan to discard the evidence without first consulting either [Plaintiff Arch Insurance] or Defendant [Broan NuTone]."  *Id*.  Broan NuTone sought spoliation sanctions for the destruction of this evidence.  The district court found that "Arch Insurance and Montgomery [County] Fire had an affirmative duty to preserve the fan/light assembly as relevant evidence in anticipation of bringing suit against Broan-Nutone."  *Id*. at * 5.

Similarly, in *Jain v. Memphis Shelby County Airport Auth.*, No. 08-2119, 2010 U.S. Dist. LEXIS 16842 (W.D. Tenn. Feb. 25, 2010), the plaintiff was injured when she slipped and fell at the Memphis International Airport.  She brought a premises liability suit against the Memphis-Shelby County Airport Authority ("MSCAA") as well as Service Management Systems, Inc. ("SMS"), the company responsible for providing janitorial services at the airport.  Plaintiff's fall was captured on airport video.  Plaintiff sent a letter to MSCAA advising that she intended to file a lawsuit, but they

failed to preserve the video. The court found that "both defendants had a duty to preserve the evidence because they knew, or should have known, that litigation was imminent." *Id.* at *9-10. With respect to SMS, the court further explained:

> Defendant SMS had a duty to make sure the video was preserved. Although SMS did not have control over the video or the equipment on which the recording was stored, SMS had a duty to make sure that the video was preserved because SMS had notice of the possibility of litigation. The record indicates that SMS had its employee . . . complete an incident report shortly after the time of the accident. SMS had knowledge of the accident and the apparent seriousness of Plaintiff's injury as well, which should have put a reasonable company providing janitorial services on notice of potential liability arising from a slip and fall. Most importantly, SMS had knowledge of airport procedures for reporting accidents, the existence of a recording system to capture radio communications, and the existence of the surveillance video system used at the airport . . . . Under the circumstances, the Court finds that SMS had a duty to take steps to preserve the video evidence.

*Id.* at * 10-11.

Similarly here, the relationship between Coach and Recon Management gave Coach sufficient control over the merchandise to warrant a finding that Coach had a duty to take steps to preserve the seized products bearing the Coach marks that were referenced in Coach's Complaints and requested during discovery. While a mistake may have been made, Recon Management did not intend to destroy the goods without first obtaining Coach's authorization to do so.

This finding is not inconsistent with the Sixth Circuit's most recent opinion in *Adkins v. Wolever*, another case relied on by Coach. There, the Court affirmed the district court's finding, based on the specific facts of the case, that plaintiff "had not established the requirements for a [spoliation] sanction because the preservation of the [prison video] 'was entirely beyond Officer Wolever's control.'" *Adkins*, 692 F.3d at 504. The Sixth Circuit further explained, however, that

13

"the district court could have followed other district courts and found [defendant] Wolever culpable even though the prison, not Wolever, lost the evidence," but that "the case law supporting such a finding does not *require* the court to find that level of negligence. The ultimate determination of culpability is within the district court's discretion so long as it is not a clearly erroneous interpretation of the facts." *Id*. at 505.

### 2.   *Culpable State of Mind*

To warrant a spoliation sanction, "the party seeking the sanction must show that the evidence was destroyed with a culpable state of mind." *Adkins*, 692 F.3d at 504. This factor is satisfied "by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *Id*. at 504-05. A spoliation sanction's "severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality." *Beaven*, 622 F.3d at 554. "Each case will turn on its own facts and the varieties of efforts and failures is infinite." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec, LLC,* 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010).

In determining Coach's culpability for the destruction of the seized products, the Court again relies on *Arch Insurance*. There, the district court found that the plaintiffs were negligent in allowing the fan/light assembly to be destroyed by a third party:

> Arch Insurance and Montgomery Fire did not knowingly or purposefully cause the fan/light assembly to be destroyed, but they were negligent in leaving it in Donan's possession. The plaintiffs knew or should have known that the City of Mount Sterling had engaged Donan to investigate the fire and that its agent Collins was paying storage fees to Donan for the relevant evidence. The City, having been fully indemnified for its loss, had no claim for damages

14

> against Broan-Nutone and no intention to bring or join a lawsuit against Broan-Nutone; therefore, the City had no duty to account for or to preserve the evidence, and no duty to continue paying storage fees on behalf of other parties who might pursue litigation.
>
> Arch Insurance and Montgomery Fire were not justified in relying on others who were under no obligation to preserve evidence on their behalf.  The plaintiffs assert multiple times that Collins and the City are "non-parties" that the plaintiffs had "no involvement or relationship with."  The plaintiffs have provided no evidence of a relationship with Collins or the City that would give them reason to believe that Collins would continue paying to preserve evidence on their behalf.  The plaintiffs do not allege any reason that they would have been prevented from taking custody of the evidence themselves or, at the very least, asking Collins to preserve the evidence on their behalf.  Arch Insurance and Montgomery Fire assert that they acted in a reasonable manner with regard to the preservation of the fan/light assembly, but under these circumstances, a reasonable plaintiff, foreseeing and intending litigation, would have taken an affirmative step to ensure that the evidence around which its theory of liability is centered would be preserved until trial.

2011 U.S. Dist. LEXIS 99043 at *6-8.  In affirming the appropriateness of the sanction imposed (a permissive adverse-inference instruction vs. summary judgment), the Sixth Circuit ruled that "[a]lthough Plaintiffs' negligence caused the evidence to be destroyed, the district court's finding that they did not knowingly or purposefully cause the destruction is supported by the record and is not clearly erroneous."  *Arch Ins. Co. v. Broan-Nutone, LLC*, 2012 U.S. App. LEXIS 26464, at *12 (6th Cir. Ky. 2012).

Similarly here, Coach was negligent in failing to take possession of the seized products from Recon Management or any other affirmative step to ensure the preservation of the products.  First, Coach knew, or should have known, that Recon Management typically destroyed counterfeit merchandise in its possession at the conclusion of criminal proceedings.  Additionally, even if the products did not technically fall within the initial disclosure requirements of Fed. R. Civ. P. 26, or the parties did not exchange initial disclosures, Coach knew that the Dequindre Defendants wanted

15

to physically inspect them.  Indeed, Defendants made repeated requests of Coach's counsel, including in discovery requests.  Had Coach taken possession of the products after any of the requests, the products would not have been destroyed.  And even if Coach's counsel mistakenly believed that the inspection requests pertained only to the 6 handbags already in his possession, he should have anticipated that Defendants would have wanted to examine the others as well.  Early on in this case, the Dequindre Defendants asserted the defense of "impossibility" – that they did not know, nor should they have known, that vendors in their Flea Market were selling counterfeit Coach merchandise because it is difficult to detect that this merchandise is counterfeit.  This also put Coach on notice of the Dequindre Defendants likely desire to inspect and utilize the seized products, referenced in the complaint, during the course of the litigation.

While the Court finds that Coach was culpable in failing to take possession of the seized products in the six months following the filing of the lawsuit, or taking any other steps to ensure the preservation of the merchandise, the Court does not agree with the Dequindre Defendants that Coach "authorized the destruction intentionally, or at the very least with reckless disregard of its duty to preserve it."  (Defs.' Mot. at 18.)  The record does not support a finding of intentional misconduct. While Coach *may* have authorized the destruction of the products, the individuals who would have been involved in the decision have no recollection of this specific conversation taking place.  From Recon Management, Mr. Schoenerr testified:

> Q.    And it was your understanding that Mr. Lau authorized the
>        destruction of the Coach products that –
>
> A.    I can't recall the conversation.
>
> Q.    Okay. Well, that was my next question.  What, if anything, do
>        you recall about it?

16

A.      Only the fact that I made this notation, that's all I can tell you
        . . . I can't remember the conversation.

Q.      Okay.   And that notation is "ok to shred" with a date of
        3/2/12?

A.      Yes.

Q.      Okay, and your assumption based on that notation, along with
        your knowledge that [another Coach counsel] had left, is that
        your conversation occurred with Mr. Lau and Mr. Lau
        authorized the destruction?

A.      Yeah, I would not have written that without –

Q.      Had he not authorized it?

A.      Yeah, but again, I can't remember the conversation.

                              * * *

Q.      Again, it's your recollection that Recon Management was
        given the authorization to destroy the items that were seized
        on July 8, 2011, at the County Line Trade Center by Mr.
        Ethan Lau?

A.      Yes, based on my note, based on the fact that, you know, and
        my recollection is that these criminal cases were done or just
        about done and there was no reason to hold onto them.

                              * * *

Q.      In fact, you don't know why Coach told you it was okay to
        destroy the goods, you don't remember that conversation
        either way, right?

A.      I don't recall the conversation.  I can tell you what my belief
        is based on my standard operating procedure at the time.

Q.      All right.   And your standard operating procedure is to
        request permission of the client or authorization of the client,
        you got it in this case, and that's why the goods were
        destroyed, correct?

A.      Yes.

> Q.     Okay. If you had known that a civil case was pending at the time, chances are even though if you had received authorization you probably would not have destroyed them, right?
>
> A.     If I had known that there was any kind of litigation still . . . . going on, no, I wouldn't have shredded or destroyed anything.

(Schoenherr, dep. at 83-84, 92, 100 - 101.) Mr. Lau likewise testified:

> Q.     Did Mr. Schoennher indicate to you from whom he received any authorization to destroy the products in question?
>
> A.     According to Mr. Schoennher, it was me who gave the authorization.
>
> Q.     It was you? That's what he said?
>
> A.     That's what he said.
>
> Q.     And I assume you're going to deny that you did so, correct?
>
> A.     I do not recall authorizing destruction of those products.

(Lau dep. at 96.) Mr. Lau also provided an Affidavit in which he further testifies:

> 9.     Coach did not desire that the goods be destroyed and did not order their disposal. There were no discussions at Coach planning or contemplating the destruction of the goods. I did not create any written materials authorizing the destruction of this evidence, including emails to Recon.
>
> 10.    During his deposition, Mr. Schoenherr testified that he likely obtained verbal permission from me to destroy the goods during a telephone call in February or March 2012. I have no memory of talking with Mr. Schoenherr at all during that time, about these goods or anything else.
>
> 11.    I would not have approved of Recon's plan to dispose of evidence pertaining to any ongoing case, and I cannot account for Mr. Schoenherr's testimony.   Assuming that the conversation he remembers did occur, it is possible that Mr. Schoenherr simply failed to apprise me that the goods related

> to these specific Defendants or to an ongoing civil case.
> Coach trusts that its third party investigators are aware of
> their obligations with respect to the handling of evidence.  If
> Mr. Schoenherr told me that the goods related only to closed
> criminal cases, I would have no reason to doubt him.  Again,
> however, I simply have no recollection of any conversation
> occurring.

(Dkt. 87, Ex. 2, Lau Decl. at ¶¶ 9-11.)

As in *Arch*, without more definitive proof that Coach "knowingly or purposefully caused the destruction" of the seized products, the Court finds that dispositive sanctions are not warranted.  *Arch Ins. Co.*, 2011 U.S. Dist. LEXIS 99043, at *12 ("Here, where the evidence was not purposely or knowingly destroyed by the plaintiffs, the extreme sanction of summary judgment is inappropriate."); *see also Flagg v. City of Detroit*, No. 05-74253, 2011 WL 4634249, at *12 (E.D. Mich. Aug. 3, 2011) (finding that "a default judgment is the Court's most drastic discovery sanction.  A fair application of the four *Harmon* factors . . . persuades me that while the [defendant's] conduct in this case – and particularly the conduct of its attorneys – is deeply troubling, entry of a default judgment is not warranted.  To borrow a concept from criminal sentencing law, a sanction should be "sufficient, but not greater than necessary" to accomplish its purpose."), *report and recommendation adopted in part by* 2011 U.S. Dist. LEXIS 114772 (E.D. Mich. Oct. 5, 2011).

### 3.     Relevance

"When the destruction is negligent, relevance must be proven by the party seeking sanctions." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004).  Relevance in this context includes "evidence which would 'naturally have been introduced into evidence.'" *Forest Labs* 2009 U.S. Dist. LEXIS 31555 at *21 (quoting *Sampson v. City of Cambridge*, 251 F.R.D. 172, 179-80 (D. Md. 2008)).  Coach acknowledges that the destroyed merchandise is at least

minimally relevant to the defenses raised by the Dequindre Defendants – i.e., that the merchandise may have been authentic and, even if not, is difficult to detect as a counterfeit.

### 4.    Punitive and Fairness Concerns

As mentioned, the severity of a sanction depends on the extent of the party's non-compliance with discovery obligations, the degree of that party's culpability, and the extent to which the non-compliance prejudiced the other parties.  *See Adkins II*, 554 F.3d at 652-53 (reiterating that a proper spoliation sanction should correspond to "a party's degree of fault under the circumstances."); *Anderson v. Otis Elevator Co.*, No. 11-10200, 2012 U.S. Dist. LEXIS 161816, at *36 (E.D. Mich. Nov. 13, 2012) (explaining that even if "Defendants may have been negligent in their [spoliation], the record does not support a finding of bad faith or prejudice."); *Goldman v. Healthcare Mgmt. Sys., Inc.*, No. 05-35, 2006 WL 3589065, at *2 (W.D. Mich. Dec. 8, 2006) ("When deciding whether to sanction a party for the spoliation of evidence, courts consider a variety of factors, but two factors carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice to the other party.")  In addition to the lack of any willful or intentional misconduct on the part of Coach, the resulting prejudice from the loss of the seized merchandise does not warrant the severe sanctions being sought.

Defendants contend that the now unavailable merchandise "consists of just about all of the evidence on which Coach relies in claiming that counterfeit products were sold and displayed at the Trade Center."  (Defs. Mot. at 10.)  But as Judge Borman has previously indicated, "[i]t is undisputed that the vendor Defendants in this case were selling counterfeit Coach goods."  (Dkt. 82 at 4, 9.)  Indeed, at least one of the individual Defendants testified that she was selling counterfeit products and all three of the individual Defendants pled guilty or no contest to selling counterfeit

merchandise.  The lead Recon Management investigator testified that they personally identified everything that was seized by the Warren Police Department and they were counterfeit products, no authentic items were seized.  (Schoenerr dep. at 77.)  These products, which a customer recognized and reported as counterfeit, were being sold at rock bottom prices at a Flea Market.  (Coach Resp. at 9; Warren Incident Report at 3.); *see also Coach v. Gata Corp.*, No. 10-cv-141-LM, 2011 WL 2358671, at *8 (D.N.H. June 9, 2011) (holding that "a reasonable person could have easily identified the counterfeit goods offered for sale at the Flea Market based on their dramatically low prices."); Dkt. 82, Op. and Order at 9 ("It would not take a rocket scientist trained in detecting counterfeit goods to suspect that the goods being sold, under the circumstances of this case, might be counterfeit and to make inquiry accordingly.")  Thus, this is a case where the destroyed goods were likely just as helpful to the party being accused of spoliation as the party claiming prejudice.

The essence of the Dequindre Defendants argument, however, is that irrespective of whether the seized products were actually counterfeit, the destruction of these goods harms them because they cannot now demonstrate to the jury how difficult it is to actually detect counterfeits.  The Dequindre Defendants claim that it is difficult for an untrained person to tell a legitimate product from a counterfeit.  (Defs.' Mot. at 10, 14.)

But the Dequindre Defendants do not need the actual merchandise to make this argument. Their representatives can testify to this fact.  They can show that Coach needs specially trained experts to identify counterfeits.  And there is no reason to believe that the destroyed handbags are materially different from the six sample goods still in Coach's possession and still available to the

jury.  On cross examination, they can also use the fact that the seized goods were destroyed.[2]

Additionally, these counterfeit cases do not always depend on the judge or jury being able to inspect the actual products.  As Coach explains, most counterfeiting cases "are litigated with the knowledge that it will be impossible to produce or account for the vast majority of counterfeits sold, and that there will be some doubt as to exactly how many goods were sold and how many marks were infringed."  (Coach Resp. at 12.)  For example, if sales records and/or witness testimony establish that the individual Defendants sold counterfeit Coach wallets, the wallets would not be available for the jury's review because they are in the possession of the purchasers.  But Coach would not be precluded from seeking statutory damages or introducing evidence, other than the products themselves, that this merchandise was counterfeit.  Additionally, the merchandise which remains contains Coach marks that can be used for statutory damages purposes.

The Sixth Circuit has explained that:

> [u]nder certain extreme circumstances, as when spoliation denies a defendant access to "the only evidence from which it could develop its defenses adequately," dismissal of an action may be a proper sanction.  *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593-94 (4th Cir. 2001).  However, dismissal is a "particularly severe sanction," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991), and is "usually justified only in circumstances of bad faith or other like action." *Silvestri*, 271 F.3d at 593.

*Arch*, 2012 U.S. App. LEXIS 26464 at * 10-11.[3]  For the reasons discussed, the Court does not find

---

[2] Coach also claims that this argument about the difficulty of detecting counterfeits is irrelevant because the Dequindre Defendants never inspected or even looked at the merchandise being sold in their Flea Market.

[3] These "extreme circumstances" existed in the *Chrysler Realty* case relied on by Defendants. *Chrysler Realty Co., LLC v. Design Forum Architects*, No. 06-11785, 2009 U.S. Dist. LEXIS 121411 (E.D. Mich. Dec. 31, 2009).  There, Chrysler hired the defendant to install an HVAC system

that Coach acted in bad faith or that the Dequindre Defendants have been denied the ability to adequately develop their defenses. *See id.* ("No allegations of bad faith have been leveled against Plaintiffs in this case, and Defendant was not denied the ability to develop its defenses adequately."). Thus, to impose the extreme sanctions being sought – outright dismissal, a bar on statutory damages, or a bar on evidence showing that the seized merchandise was counterfeit – would have little deterrent effect on a party that did not act with sufficient culpability.  It would also result in too great a windfall on the Dequindre Defendants.

## III.   CONCLUSION

Accordingly, for the reasons set forth above, the Court **RECOMMENDS** that the Dequindre Defendants' Motion for Spoliation Sanctions be **DENIED**.

## IV.   FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and

---

in a Chrysler dealership.  When the dealership claimed the system was not working properly, Chrysler hired an engineering firm to remove and destroy the system without giving defendant an opportunity to evaluate and correct the situation.  (*Id*. at *14.)  Thus, Chrysler clearly directed the destruction of the evidence.  Judge Borman found that the destroyed evidence was "crucial" and that terminating sanctions were needed to "level the playing field."  (*Id*. at *15-16.)  Here, both sides have been impacted by Recon Management's actions and, like many counterfeiting cases, not all of the merchandise is available for trial.  The absence of this merchandise, however, did not prevent the Dequindre Defendants from filing summary judgment motions.  (Dkts. 97, 99.)

Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: March 25, 2013


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 25, 2013.


s/Jane Johnson
Deputy Clerk